The New York Legislature enacted the Opioid Stewardship Act to raise critically needed revenue to respond to the opioid crisis. For two reasons, plaintiffs' challenge to the Act's revenue-raising measure should be rejected. The first is that under the Tax Injunction Act and Tax Comedy, their request for federal judicial relief to prevent New York from collecting revenue for public purposes is jurisdictionally barred. And second, even if there's jurisdiction to consider their claims, the revenue-raising measure here is severable from a separate prohibition the District Court struck down that prevented the cost of that assessment from being passed on to end users. On the jurisdictional question, the Tax Injunction Act prevents federal judicial relief when a state imposes a revenue-raising measure that is for a public purpose, meaning that it is not raising money from regulated entities to fund the very program that regulates them, but instead is going to benefit people outside of that program. And here the Opioid Stewardship Act does exactly that. The money that is collected from opioid manufacturers and distributors doesn't go to benefit those companies. It doesn't go to fund the Department of Health's regulation of those companies. Instead, it goes to different agencies, to different programs, and to benefit a different population of individuals. Where does it go? Where do the payments go? It goes to a specialized fund that is dedicated to benefit people who are outside of the regulatory scheme, namely individuals who have been harmed by the opioid addiction crisis and who need the prevention, treatment, and recovery services. What's the difference between the specialized fund and the general fund? The relationship between them is the specialized fund's money can be used only for the purposes that the legislature has dictated in the statute. But that doesn't remove it from the status of a tax, because the purpose for which the fund is directed is the type of public purpose that the Tax Injunction Act is meant to protect. And it's a public purpose because, as distinct from what this Court found in Travelers, it doesn't provide a narrow benefit to these companies who are not the beneficiaries of the assessment. I'm interested in specific nomenclature, but why didn't the legislature call it a tax? I think for the reasons that the Seventh Circuit identified in Empress Casino, which is that legislatures are often concerned about how the money has been used. And to avoid annual appropriations battles, they will dedicate that money to specific purposes to ensure a reliable revenue stream. And this is not a judgment unique to this particular fund. The excise taxes collected from cigarettes, for example, goes to the Healthcare Reform Act fund, which in the statute, in New York law, is dedicated to specific purposes, including treatment and support services there. Excuse me? They are called excise taxes. But the point here is that the use of a special fund is not disqualifying for these jurisdictional purposes, so long as the purpose of that fund is a public  one. And the kind of specialized fund that would not be covered by the Act are those where the fund is used for the purposes of the very program for which the money is collected. To give an example, in this very context, Department of Health collects from these companies licensing fees that it uses to fund the administration, the quite costly administration of the program over these companies. That is not what this money is being used to. DOH does not use this money to regulate these companies, but rather to benefit people who have been harmed by the addiction crisis outside of the regulated program. And the various factors, in addition to the use of the specialized fund that the district court and plaintiffs here rely on to distinguish this case from a tax, are all immaterial given this fundamental purpose. I mean, the labeling. Courts have rejected the idea that the label of a statute is important. The use of the specialized fund is not important. And in particular, the fact that what this is trying to do is to deal with the consequences of the plaintiff's actions also does not remove it from the status of a tax, because courts have routinely recognized that sometimes the harms caused by regulated entities can be public harms that require a public policy response. And so the restraint that the district court imposed here on the collection of this revenue triggers precisely the concerns that the Tax Injunction Act and tax comedy were meant to address, which is preventing New York from getting $100 million per year that the legislature found that it needed in order to address a pressing crisis. To be clear, plaintiffs are able, if this jurisdictional bar applies, to bring their claims back in state court. And it's particularly appropriate for them to do so for their severability claim, because severability is a question of legislative intent. And the Supreme Court found in the Levin case, which was a tax comedy case, when the question is what the legislature would have intended with the statute, what it claim, it is appropriate to leave that question to the legislature, because it is their intent that matters here. On the question of severability, the reason that severability should apply here and the revenue-raising measure should be seen as distinct from the pass-through prohibition is that the legislature enacted the statute really for two separate reasons. The most important and critical one was to raise money to fill a gaping hole in the crisis. And then separately, they wanted to protect downstream consumers from price increases as a result of these assessments. So let me ask you about that. If we agree that the pass-through is severable, the effect is for those two years, the purchasers are going to bear the price of these drugs, and that was contrary to everybody's intention that this should be punitive on these manufacturers. They should pay for what they've done. And if they could pass it on to the consumers, they're not going to be paying for anything. Well, I'll say two things for that. First is this was not a punitive purpose of the statute. But even if the point here was to leave the costs on the manufacturers and distributors, that's a valid civil purpose. It is what tax statutes do, for instance, when they define the legal incidence of a tax, is to leave it with a particular group of entities. But you don't challenge the invalidity of the pass-through? That's correct. We have not challenged that the district court is holding on that front. But the second point I want to raise is an important distinction. We don't dispute the legislature wanted to enact the pass-through prohibition and thought at the time that it served an important purpose. But severability asks a different question with a different answer, which is, would the legislature have thrown the baby out with the bathwater? Would they have given up $100 million a year to fund programs that didn't have that money before if they'd known the pass-through prohibition was not available? And here, every indication of legislative intent is they did not find these inseparable. I mean, the first is that they included an express severability clause saying that if any provision of the statute is struck down, every other should survive. That's a sharp contrast with prior statutes, like the one dealt with in Mobil Oil, that included an anti-severability provision that said everything will fall all at once, as this Court recognized. But the second is that in response to the district court's ruling here, the legislature looked again at the budget hole, looked again at the problem with addiction services and the gap in funding for those services. And they enacted, they basically reenacted this statute. They came in and said the same companies that are suing here will pay again and we won't reenact the pass-through prohibition. And that subsequent enactment confirms that what the legislature wanted to do here first and foremost was to make sure that the people suffering from the opioid crisis got the services that they desperately needed. I mean, to put this point another way, you know, even when the legislature acts for multiple purposes at the same time, when it comes to severability, the more difficult question is whether the legislature thought that these things should stand or fall together. And here, from what the legislature did both at the time of the enactment and afterwards when they were faced with a world where there was no pass-through prohibition, they have confirmed their desire to raise this money, dedicate it to a public purpose, and to ensure that the people who needed this money most seriously could get it, notwithstanding the pass-through prohibition's invalidity. If we were to agree with you, what would be the decreed result? I mean, you're asking for reversal, but you're not really challenging, as you put it, the invalidation of the pass-through scheme. Well, that's correct. I say there's two answers to that. If this Court finds there's no jurisdiction under the Tax Injunction Act, then there is a reversal and a dismissal of all of their remaining claims against the assessment, right? Again, we are not appealing from the separate part of the Court's ruling on the pass-through prohibition. But that would channel the remainder of their claims, to the extent there are any, to the State courts to resolve instead and get the Federal courts out of this business. On severability, if this Court were to reverse, that was the only ground on which the district court struck down the assessment. And we do think in that case, if there's jurisdiction and severability is improper, that it would return to the district court to continue further proceedings. Thank you, Judge. That's correct. And what exactly, to follow up on Judge Loyer's question, what exactly would be the decreed language? What is it that we would be instructing the district court to do? Well, it would be vacating the preliminary injunctions that were issued for some of the cases that are now on appeal and reversing the grant of summary judgment on severability if this Court reaches it, or vacating and reversing if it's on jurisdictional grounds instead. And there would be a remand? If it's not on jurisdictional grounds, there's nothing left to this case. If we think that the TIA applies and no subject matter jurisdiction, reverse, we're done. That's correct. And they would bring their claims in State court to the extent they want to pursue them further. And it's just severability, because they brought multiple claims below, and that was the only one the district court ruled on. If that were the basis for this Court's ruling alone, there would remain further proceedings below on their other challenges. Thank you, Mr. Wolf. Thank you. May it please the Court, Michael Kimberley on behalf of Plaintiff Appley Healthcare Distribution Alliance. Your Honors, with the TIA, Congress did not bar Federal court review of all State law efforts to raise revenue. Rather, Congress limited the TIA to taxes only, leaving Federal courts free to hear challenges to fees and penalties. And here, every relevant factor points inexorably to the conclusion in the district court's holding that the OSA assesses both a regulatory fee and a regulatory fine. Is it right that this fee or these fees don't go to the Department of Health to refund them for whatever costs they spend in administering this program? Well, I think it's fair to say it's not a use fee. It does go to the Department of Health. The Department of Health is the agency that assesses the tax. It's the agency that, in effect, administers the surcharge and administers the funds once they come into the special fund. They do go to offset costs incurred by the agencies because of the activities of the regulated entities paying the fee. In part. But not all the costs go or not all the payments go to that. As I understand it, the payments go well beyond trying to reimburse the Department of Health for its costs. Is that correct? Point in fact, that's not correct, Your Honor. These are all costs incurred to address the externalities of opioid manufacturing and distribution. Are those costs exclusively incurred by the Department of Health? My understanding is that there are costs associated or costs that arise that go well beyond the administrative costs. Your Honor, there are three things that are funded by this surcharge. It's opioid treatment services. It's recovery and prevention services related to opioid abuse and use. Education services. All of that is in addressing externalities. And part of it also goes to fund a prescription monitoring program, which is an effort to keep on top of doctors' prescriptions of opioid use. It's all to address externalities. What does that mean to address externalities? I mean, in the context of this case, if some of those externalities involve things that are separate and apart from the specific mandate of the Department of Health, then that's an externality that I might regard as tax-related as opposed to a fee for the benefit of the agency. Well, I would point, Your Honor, to a handful of cases that have dealt with revenues that are used in this particular way. One is the head money case. It's a case from the 1880s from the Supreme Court which said that an assessment per person, per immigrant used to offset the externalities of bringing immigrants into the United States was a fee and not a tax because it was used for that specific purpose. Gen On, a Fourth Circuit case where, in fact, it was only half of the proceeds of the fee were used to offset greenhouse gas emissions assessed against power plants in Montgomery County, Maryland. And Trailer Marine in the First Circuit where the proceeds of the fee assessed were used to offset the externalized costs of car accidents. Each one of those cases assessed what the courts determined were not taxes but fees, although they did not go to benefit the particular payers. They went to offset costs inflicted by those payers. Thank you. Go ahead. So if I may, I should say also I think it's very important that the court take a broader view of the analysis here. There are a number of factors, all of which point in favor of the district court's conclusion. The assessment is not called a tax. It is not collected by taxing authorities. It is placed in a segregated fund, not into the state's general fund. It is earmarked for the specific purposes, Judge Loyer, that we were just discussing. It's assessed in a fixed sum rather than on a per volume basis, which is not the way that we're aware any other tax operates. The surcharge is assessed for pre-enactment conduct, and it includes a pass-through prohibition. What this Court held in Con Edison is those are hallmark indications that it is, in fact, a punitive measure. And the punitive elements of the surcharge, I think, are relevant both to the question of whether it's a tax for purposes of the TIA and also for the question of severability because of the tax. And the question is, how can we express severability clause in the statute? So they knew that there was a possibility that this pass-through or any other provision might not survive, and yet they inserted that provision. So how can we look behind that and say, you didn't really know what you were doing when you put in that severability clause? What you really intended was the whole statute would fall if the pass-through  So I have two answers to that, Your Honor. The first is, as this Court said in national advertising, the presence or absence of a severability clause is not dispositive. And, in fact, and I'm quoting now, it will rarely, the question of severability will rarely turn on the presence or absence of a severability clause. Is that a State or a Federal severability? It's a Second Circuit case concerning New York law. And two cases cited in that case are Superfund Coalition and Borelli, both of which are cited in our brief, both of which are New York court of appeals decisions in which there was a severability clause and the New York court of appeals ultimately held, nevertheless, that the offending provision could not be severed. So as a matter of New York law, it simply is not the case that the severability provision by itself dictates the outcome here. And, in fact, when you look at the structure, context. Breyer, if we were to agree with Mr. Wu, all of this would go to the State courts and they could make that determination separate and apart from the determination made by Judge Fehler or us about severability, no? Your Honor, if the Court found that the Tax Injunction Act applied, that would be the upshot. But, again, given all of the factors here, I think it would be quite remarkable to think that this is a tax in the traditional sense. I would say also the Tax Injunction Act. Well, I guess I'm focused. See, there's a little bit of a cart and horse problem here, I think. But I'm focused now on the severability issue. And what you tell us is that as a matter of New York law, this is pretty clearly severable. Or this is pretty clearly severable. And I wonder if we just sent this all to New York State to determine, then we wouldn't have to deal with this issue. If the Court has subject, if the district court properly had subject matter jurisdiction as we contend that it did, I don't think it has a choice about sending the question to the State courts. Federal courts in this circuit determine the question of severability under State law on a regular basis. There's nothing unusual about that. And in our view, the outcome here is relatively straightforward and clear. But is there a case, you're asking us to rely on New York State law relating to the severability clause here, right? And you are saying that it's not severable and that Judge Fehler got that right, correct? Correct. Is there a case where, I mean, this is very, as Judge Rice pointed out, this is very explicit language. And then what Judge Fehler does is go to the legislative history. Is there a case where a very explicit language about severability that comes from the New York State legislature is disregarded by the New York Court of Appeals, where the New York Court of Appeals, faced with very clear language, says we'll disregard it and determine that, in fact, whatever the provision is, is not severable? Yes. That's the Superfend Coalition case and the Borrelli case, as I mentioned earlier. In both of those cases pending before New York State courts, there were express non-severability provisions in which the State court held, nevertheless, that the offending provision could be severed. And it's for precisely that reason that this court, in national advertising, 942 F. 2nd 148. Can I ask you, that's the flip side of what we're asking about. So non-severability clauses was what you were talking about. Those statutes had clauses that said it is not severable. Is that what you're telling us? Yes. Just precisely like the provision in this case. Okay. And but this one says it is severable. So no. I'm sorry. I misspoke. Okay. The provisions are the same. So the provisions in those two cases are circumstances where the legislature said if any part of the statute is found to be violative of the law, it can be severed. And the New York Court of Appeals in both of those cases said, nevertheless, we will hold that it cannot be severed and we will strike the entire statute. That's, again, why in national advertising this Court held, construing New York law, that the presence or absence of the severability clause is not dispositive of the question. And just to finish the thought, again, looking to the text of the statute, the presence of the pass-through prohibition, which this Court in Con Edison said is a hallmark of a punitive measure, you couple that with the structure, which includes a $1 million per incident fine for violations of the pass-through prohibition, an indication that the legislature really wanted this statute enforced and wanted to be sure that the punitive purpose was met and that the cost could not be passed on. And then you couple that with a very clear legislative history. There's we think it's a straightforward case for severability and that the lower court should be affirmed. Thank you, Mr. Kimbley. I gave you some extra time, but Mr. Rowan wishes to be heard, and we'll hear from him now. Thank you, Your Honors. Matthew Rowan on behalf of AAM and SPEC-GX. So I want to just pick up on the issue of the decretal language that Judge Cabranes and Judge Loyer brought up. So in the State's opening brief before this Court, the State made no argument that the district court's invalidation of the anti-pass-through provision itself was problematic under either the TIA or the Comedy Doctrine. So at the very most When did that first come up, in your view? Well, I think that first came up before the district court. So I think that was an issue that if the State – I mean, in fact, there was a dispute at oral argument in the district court, and Judge Falia asked Mr. Farber there on behalf of the State, you know, do you think that the TIA applies if I just look at the claims to the anti-pass-through provision or to the writable share payment itself? And I don't have the language directly in front of me, but I believe Mr. Farber's answer was something like, I don't think my argument is quite as good with respect to just the claims on the anti-pass-through provision. And that makes sense, given this Court's decision in Mobile Oil v. Tully, which addressed a claim, a constitutional claim, against an anti-pass-through provision in their what was unquestionably a tax law. So while they make some argument in their reply brief that they say there's some doubt as to whether, I think that's at page 31 of their reply brief, as to whether the TIA or the Comedy Doctrine applies, I mean, I don't think they can actually get the benefit of the argument they're making this morning that this Court should outright reverse at the very most, given the arguments they've made in their decision not to defend the anti-pass-through provision itself. The very most that they could get here is a vacator and a remand to Judge Foglia to determine the proper remedy that my clients are entitled to as a result of the invalidation of the anti-pass-through provision. So that's the most that the State could hope to win today. And I think it's important to understand that the argument that they're making, that severance would somehow remedy my client's injuries, is — it simply makes no sense with respect to the time periods that we're looking at. So we've always contended — Breyer, is the TIA not a statute that strips Federal courts of subject matter jurisdiction? Yes, it is, Your Honor. And is this Court — I agree with — maybe I've misunderstood your argument. Sure. So the argument — so the TIA is different from the AIA. So the AIA, the Anti-Injunction Act, applies to suits. So the TIA has been held to apply to claims. And under this Court's decision in Mobile Oil v. Tully from the 1980s, this Court held that a constitutional attack on an anti-pass-through provision, which there was part of a New York tax law on oil companies' gross receipts, is not a claim that leads inevitably to restraining or enjoining the assessment of any tax under State law. And in fact, I mean, we think that it follows a fortiori from that decision that even if this Court thinks that the rateable share payment is a tax, and even if this Court thinks that the necessary consequence of striking down the anti-pass-through provision is that the rateable share payment can't be assessed with respect to sales for 2017 and 2018, we think that even if this Court thinks both of those were true, which we disagree with, that the district court still had jurisdiction to invalidate the anti-pass-through provision and follow through with that because of Mobile Oil v. Tully. So what happened in that case is there was a 2 percent tax that New York enacted on oil companies' gross receipts that was derived from their sales in New York. It was unquestionably a tax law. Unlike this law, it was in the tax code. The monies went to the tax commissioner. Sort of other than the presence of the pass-through prohibition had all the usual hallmarks of a tax, which isn't true of this law. But unlike here, there there was an anti-severability clause. So essentially the Court knew the question, knew the answer to the severability analysis before it reached the merits. But so it knew if I strike down, or if the Second Circuit struck down the anti-pass-through clause, what would happen is that the State would be restrained from collecting the tax. That was the inevitable consequence of affirming the district court's invalidation of the anti-pass-through prohibition in Tully, and yet this Court affirmed that decision. So, I mean, we actually think that this Court follows ineluctably from that decision. But even if this Court somehow disagrees, I mean, I just want to emphasize that there is no dispute, or at least there wasn't until Mr. Wu stood up today, that the most that this Court could do is vacate the severability holding and remand a judge Falia to fashion a remedy. And I think what I'm having a problem with this argument, because in their opening brief they asked for reversal. Yes. And we think we think that they actually can't ask for that. If you read what they actually said in their opening brief. This is not the first time that we're hearing it. This is just. Well, if you actually read what they say, they make no argument in their opening brief that the invalidation of the TIA of the anti-pass-through provision itself was problematic. And perhaps in our brief we could have been clear as to the problems of what they were asking for, but we took them to be asking for reversal sort of on, you know, part and parcel of you do this and you do that. But if you actually look at the arguments that they made, they never argued that Judge Falia's invalidation of the anti-pass-through provision itself was problematic. And if they didn't argue that, and I'm happy to have this Court take a look at their arguments, it's never in there. The first time they raise it is in their reply brief. And this was an issue that was before Judge Falia. Roberts. Did you argue before Judge Fala that the provision was severable? So the argument that we made was that on a forward-looking basis, the provision was severable. But we also said, and I mean, the language here is that, so the clearest of that was that from JA-1020 to 1025, which is the transcript of the oral argument before Judge Falia, so 1025, what we said is, with respect to the surcharge assessed based on sales after severance happened, our clients would have a remedy. But with respect to the surcharge assessed on sales before severance happened, our clients would not have a remedy because with respect to those sales, of course, we couldn't pass it on anyway. So the clearest indication of that is at page JA-1020, where it said, retroactivity that the statute applies to sales that happened in 2017 and the first half of 2018, that can't be avoided at all. So the argument we were making on severability was always bifurcated. And the reason it's not bifurcated now is because the legislature, after Judge Falia issued her decision, amended the OSA so that it only applies to that retroactive period that we were talking about there. So I see that I'm over my time. All right. Thank you, Your Honors. Thank you. I just want to make a couple of points. And one is that, as a point of clarification, the statute here does not direct any of the money collected from these companies to DOH's costs of regulating them. I don't think a single— Say that again. It does not go to DOH to regulating these companies. Instead, what the money is directed to are sort of two main buckets. One is it goes to a separate state agency known as OASIS that provides money to run its own addiction treatment programs and to fund state, local, and private providers of addiction services. It's a separate agency, but what's the relationship with the Department of Health? It's just a separate agency. It is not in the Department of Health. It is a separate agency that runs separate services for the individuals harmed by addiction generally and the opioid crisis specifically. And the second, it does go to DOH, but not for regulating these companies, but instead to run the prescription drug registry, which is a registry that's used by doctors and providers to make sure that they know their patient's prescription history. It's not a registry that manufacturers and distributors use. So, for both of these purposes, what is happening is there is no benefit that is going directly to the manufacturers and distributors. There's no money going to DOH to—it's not defraying the cost of DOH's regulation of these companies. It's being used to handle what, you know, my friend on the other side sort of euphemistically calls the externalities of these companies' conduct here. And that—what that word is describing here is the very public health crisis that the New York legislature has responded to, not just with this statute, but with any number of other efforts to provide the treatment and prevention services that these addicts need. Second, on the question of severability here, New York law is extremely clear that there's a strong presumption of severability because of the New York court's respect for the legislature's intent here and preserving what it can of the legislature's underlying judgment. The language that's used in New York cases is that provision shall be severable unless the conclusion is unavoidable that the legislature would have abandoned the entire effort. Your colleagues cite to Borelli the New York Court of Appeals case. What's your response to that? Well, Borelli dealt with a special situation where the provision that the court invalidated there was the one that authorized the agency to regulate at all. Like, in that case, it was a city agency, was not allowed to even enter into the space of regulation of outdoor cigarette smoking. And I think if something goes to such a fundamental part of a regulation, then it makes sense that other pieces, such as, you know, like requiring reports to the agency, also will fall because if an agency can't regulate, everything else sort of follows from that. But this case is very, very different. And again, the legislature here had the primary purpose of raising money, right? And then the secondary purpose of making sure that after that money was raised, that there wouldn't be price increases. And that's a distinct and fundamentally important purpose that should be preserved. Could you just, with the acquiescence of the presider, answer one question? So one of your colleagues also pointed out that the — what you would describe as the tax comes in the form of a fixed sum as opposed to a rate. And I think that it's right that I've not been able to identify a tax that comes in that form. What's your response to that? Well, I have two answers. One, that there are taxes that come in that form. In our briefs, we identify a federal tobacco tax that is used to benefit tobacco farmers that sets, I believe, a $10 billion threshold collected over 14 years. And so it's sort of — you know, it's just a different way of assessing and collecting that money. But the second is that it might be distinct and unusual in the mine run of tax statutes, but it actually confirms the thing that is important for both our jurisdictional and merits arguments, which is that the legislature wanted, above all things, to make sure that $100 million was raised every year. So if anything, it confirms that what the legislature's goal here was to raise revenue, and that goal should be preserved even if the pass-through prohibition is invalidated. Thank you. Thanks very much, Mr. Wu. Thanks to all counsel. Very well argued, and we're grateful for your presence today. We'll turn to Whalen and Grillo versus SEIU. Okay, Mr. Jennings. May it please the Court, my name is Jeffrey Jennings. I represent the two appellants in this case, Kiernan Whalen and James Grillo. The district court below should be reversed for two reasons. First, it ignored this Court's decision in Penske versus Duncan that when courts are looking to see if an exception to Section 1983 liability exists, it should look to the common law to see if there's an analogous tort. And second, to the extent that the district court did look to the common law, it was wrong to say that abuse of process is an analogous tort to a First Amendment claim. First, the district court ignored Penske versus Duncan. There, this court was considering a due process violation under Section 1983 for damages. The court, this court was very clear in Penske that it was looking to the common law to see if there was analogy that should be adopted. In that case, the court found that malicious prosecution was analogous to a due process violation, thus it was appropriate to adopt the elements of malice and lack of probable cause. So that case makes clear that you have to look to the common law. And second, that we're not talking about some type of across-the-board affirmative good faith defense. Rather, what we're talking about are the elements of the claim that the plaintiff has to prove. Penske also shows that there has to be a tightness of fit between the constitutional violation alleged, there it was due process, and then also the common law tort analogy that's being adopted, there it was malicious prosecution. Two Supreme Court cases also emphasize that point in the context of qualified immunity. In the Owen versus City of Independence case, there the Supreme Court said that there was no history of cities enjoying any type of good faith immunity at common law, and therefore cities should be exposed to liability. That was true even though there was some exceptions to that where cities at common law, if they were acting in a governmental capacity, did enjoy certain types of immunity. But the court said that that wasn't enough for there to be an across-the-board immunity. Likewise, in Tower versus Glover, the Supreme Court also said that public defenders are exposed to liability. There was no good faith immunity at common law. That was true even though defense counsel at common law enjoyed a privilege if they said defamatory things in the course of judicial proceedings. The court was clear that that didn't fit the situation before there in Tower versus Glover of a public defender and a prosecutor conspiring together to secure somebody's conviction. Here, of course, I'm sorry. Go ahead. Go ahead. Here, of course, the conduct that's alleged to be violative was conduct that relied on a statute and, frankly, on a Supreme Court case, Abood, that found the statute constitutional, correct? Yes, Your Honor. Is there any common law authority that says that a party can't rely in good faith on a statute that has been explicitly found to be constitutional by the Supreme Court of the United States? No, Your Honor, but I think the Supreme Court cases make clear that when you're looking to the common law, there has to be a tightness of fit between the common law analogy and the constitutional violation. I understand that, but you answered my question, no. You started your answer by saying no. So there's no common law authority that says that it's you can't rely on a statute that the Supreme Court itself has found explicitly to be constitutional. Well, Your Honor, my understanding at common law, there's no instances where private parties have some type of affirmative good faith defense to every type of tort. When the court's looking at these types of examples, for example, with due process, they found an analogy to malicious prosecution. In those situations, if a private party was sued for damages for misusing a court due process, they had to prove the elements of malice and lack of probable cause, which are two prongs that go to the state of mind. And as the Supreme Court's footnotes in Wyatt v. Cole make clear, when we're talking about a good faith defense, we're not talking about an affirmative defense like statute of limitations. I understand. Rather, what we're talking about are the elements that a plaintiff has to prove or a good faith defense in the sense that the defendant's rebutting the elements of malice and lack of probable cause. And that brings me to my next point. Abusive process has nothing to do with the First Amendment. The district court below relied on that as being a reason why they could say there is a good faith defense. But abusive process is limited to court processes. It's not beyond that at common law. It wouldn't expand to other types of processes, like in this case, a collective bargaining agreement where the state and union were conspiring to force people to speak on behalf of political causes with which they disagreed. And that really brings, shows the rub of it. I mean, this is a First Amendment claim. It's about free speech. It has nothing to do with misusing a court process. And because of that, because there's no fit, this case falls within Owen v. City of Independence, where there the city was exposed to liability. And here, too, the union is exposed to liability because there's nothing at common law that would be appropriate to adopt as a common law analogy. And I'll just conclude. Do we say at common law you were expected to adhere to a statute that had been ruled constitutional by the highest court? That doesn't seem to be a controversial proposition. So everybody was, that was the rule of law. You were expected to adhere to it. That was the common law. Is that a fair characterization? Your Honor, I mean, I think it's always been true that courts are bound by what the Supreme Court said. There is a Berzall case where it generally talks about how there's authority that it's reasonable to rely on the law at the time. But that kind of shows just that what we're talking about here is that at common law, to the extent that, like with malicious prosecution, it had two prongs. There was a subjective prong and then also an objective prong of showing lack of probable cause. So even if it was reasonable to rely on the law, the plaintiff could then still look at the subjective element to see if somebody knew that the law was about to be overturned or that it was unsettled. And so for those reasons, we still think that bad answer is this case. And I'll just conclude there and save the rest of my time for rebuttal. May it please the Court. I'm Scott Cronland for the union. The union was following State law and Supreme Court precedent when it received fair share fees to pay for collective bargaining. The district court was therefore correct to dismiss the Section 1983 damages claim against the union. In Lugar, when the Supreme Court first interpreted Section 1983 to mean that a private party that relied on a statutorily authorized process to obtain the assistance of the government could be considered a State actor, the Supreme Court also recognized that that could lead to an injustice. And the Supreme Court suggested that that problem, which is what the Court called it, should be addressed by establishing a defense. And since Lugar and the Supreme Court's subsequent ---- Breyer, you're asking us to embrace as a broad good-faith defense across the board. But across the board in the sense that whenever a private party is being ---- And that poses its own problems, it seems to me. We're not asking across the board for every 1983 case. We're suggesting that when a private party is sued under Lugar because it relied on a statutorily authorized process to get the government's assistance, the species of common law tort that is most analogous are the same species of tort that applied in Wyatt and Pinsky. They're the malicious prosecution, abusive process species. Do you view that Pinsky requires us to undertake the approach that Pinsky itself undertook, or is it just the acknowledgment that a good-faith defense may exist in a particular case, in a 1983 case? We don't think the Court has to do that. The principles of equality and fairness that are referred to in Wyatt apply without regard to a specific common law analogy. But if the Court does look for a specific common law analogy, the most analogous torts would be the abusive process, malicious prosecution species of tort. And plaintiffs have not suggested ---- But all of those are, as your friend suggested when he was up, those deal with the judicial process itself, right? They do, your Honor, but there isn't a more analogous species.